UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STEPHEN R. S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:20-cv-01160-GCS[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM & ORDER**

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

**PROCEDURAL HISTORY**

Plaintiff filed for DIB on February 7, 2018; in his application, he alleged that his disability began on April 26, 2017. (Tr. 13). However, Plaintiff's claim was unsuccessful, both initially and on reconsideration. *Id.* On December 31, 2019, the Administrative Law Judge ("ALJ") held a hearing on Plaintiff's case. *Id.* Plaintiff testified and was represented by counsel. *Id.* Nevertheless, on January 30, 2020, the ALJ determined that Plaintiff was

---

[1]   In keeping with the court's usual practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]   This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 12).

not disabled. (Tr. 24). Plaintiff timely appealed the decision, but on September 30, 2020, the Appeals Council declined review, making the ALJ's decision the final decision of the Commissioner. (Tr. 6).

## ISSUES RAISED BY PLAINTIFF[3]

Plaintiff raises the following issues:

1. The ALJ erred in providing an incomplete residual functional capacity ("RFC") assessment which was not supported by substantial evidence; and,

2. The ALJ improperly discounted Plaintiff's subjective symptom allegations.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform

---

[3] As the Court finds that remand is appropriate on issue (1), it does not address the other outstanding issue in this case. Therefore, the Court finds that issue (2) is moot.

his or her former occupation? and (5) Is the plaintiff unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential,

it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. He first found that Plaintiff did not engage in substantial gainful activity from the alleged onset of his disability through the date on which he was last insured. (Tr. 15). The ALJ found that plaintiff had severe impairments of vascular insult to the brain, coronary artery disease, and obesity. *Id*. These impairments significantly limited Plaintiff's ability to perform basic work activities. *Id*. Though the ALJ also found impairments of stable branch retinal vein occlusion of the left eye, peripheral arterial disease, left knee dysfunction, and depression and anxiety, he did not find that these alleged impairments significantly limited Plaintiff's mental or physical ability to perform work-related activities. (Tr. 16).

Although Plaintiff suffered from severe impairments, the ALJ determined that these impairments and the combination of the impairments did not meet or medically equal the severity of those impairments listed in 20 C.F.R. § 404. (Tr. 17-18). Of particular importance to this case, the ALJ found that Plaintiff's vascular insult to the brain did not meet or medically equal Listing 11.04. (Tr. 18). In order to meet this listing, Plaintiff was required to demonstrate that he had a central nervous system vascular accident accompanied by one of the following more than three months post-vascular accident: (i) sensory or motor aphasia resulting in ineffective speech or communication; (ii) significant and persistent disorganization of motor function in two extremities, resulting in an

extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or (iii) that he had a marked limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing himself. *Id*. However, as the ALJ considered the latter factors when determining Plaintiff's mental impairments, those most pertinent to this issue were factors (i) and (ii). The ALJ found that Plaintiff did not demonstrate the requisite symptoms more than three months after his post-vascular accident. (Tr. 18).

When making this decision, the ALJ considered Plaintiff's testimony during the evidentiary hearing. (Tr. 19). Plaintiff testified that he experienced a stroke in both April and May 2017. *Id*. As a result, he experienced a facial droop, left side weakness, and difficulty eating. *Id*. Though he occasionally drove short distances, he testified that he struggled to stay in the center lane and would often drift left. *Id*. The ALJ found that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of these symptoms was not consistent with the medical evidence and that Plaintiff was capable of performing light work. *Id*.

The ALJ arrived at this decision by examining the relevant medical records. (Tr. 20). Overall, the ALJ found that Plaintiff's treatment records demonstrated improvement. *Id*. When Plaintiff was first admitted to the hospital for treatment after his stroke, he exhibited decreased sensation in his left body, but demonstrated five out of five strength in the bilateral upper and lower extremities. *Id*. Plaintiff did not meet the criteria for acute rehabilitation at that time. *Id*. When Plaintiff returned to the emergency room on May 5,

2017, he exhibited a left facial droop, slurred speech, and confusion. *Id*. However, his grip was strong, and his gait was normal. *Id*. During a May 11, 2017 follow-up, Plaintiff was referred to physical therapy for what the ALJ called "very subtle weakness of the left upper extremity." *Id*. Between May 31 and June 2, 2017, Plaintiff was admitted to the hospital for dysphagia. *Id*. During the hospitalization, Plaintiff demonstrated "a little" left facial droop and "a little weakness" in the left upper extremity, according to the ALJ. *Id*. However, the ALJ noted that Plaintiff's records indicated he could also play cards, and that by June 13, 2017, "he demonstrated only mild weakness in the left elbow and shoulder, and his left grip averaged 86 pounds." The ALJ determined that Plaintiff's strength, fine motor, and cognition had improved over the weeks of his hospitalization, supporting an RFC that did not overly limit Plaintiff's use of his left hand. *Id*. In arriving at this conclusion, the ALJ cited to records from Plaintiff's physical therapist and notes from his hospitalization. *Id*.

The ALJ also considered the medical opinions and prior administrative medical findings of State Agency Consultants ("SACs"). (Tr. 21). However, the SACs' findings stated that there was insufficient evidence to assess the claim. (Tr. 22). Accordingly, the ALJ explained that he therefore relied on evidence submitted at the hearing level, including Plaintiff's testimony, to evaluate the claim. *Id*. This evidence included Plaintiff's medical records from May through August 2017, as well as evidence from 2018 and 2019. (Tr. 27-28). Particularly pertinent are the May 31 through June 13 hospitalization and physical therapy records on which the ALJ relied when finding that Plaintiff was capable of using his left hand.

After careful consideration of the record, the ALJ crafted the following RFC:

> Plaintiff had the RFC to "perform light work as defined in [20 C.F.R. § 404.1567(b)] except: he could occasionally climb ladders, ropes and scaffolds; he could occasionally climb ramps and stairs; he could occasionally stoop, crouch, kneel, and crawl; he could have no exposure to unprotected heights; he could handle that is gross manipulation frequently with the left upper extremity; and he could perform fingering that is fine manipulation of items no smaller than the size of a paperclip frequently with the left upper extremity."

(Tr. 18-19).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. As Plaintiff is successful in his appeal of the ALJ's decision regarding his left hand strength, specifically, the Court has provided only the relevant portions of the evidentiary record below.

### 1. Evidentiary Hearing

Plaintiff was represented by an attorney during the December 31, 2019 evidentiary hearing. (Tr. 31). In her opening statement, Plaintiff's attorney noted that he suffered a stroke on April 26, 2017, but had continued to suffer additional strokes and stroke-like symptoms during that time. (Tr. 34). In addition to memory and speech problems, Plaintiff also continued to suffer from left-sided weakness. *Id*. Plaintiff's attorney asserted the combination of Plaintiff's difficulties would prevent him from being able to do any full-time employment. (Tr. 35).

When examined by the ALJ, Plaintiff stated that he is right-handed. (Tr. 36). He self-imposed limitations on his driving because he was not able to stay in the center lane, and he often drifted to the left. *Id*. However, he also explained that he was capable of

"short jaunts" to pick up groceries or fast food. *Id*. In fact, he testified as to driving as recently as early December. *Id*.

Plaintiff also confirmed that he continued to experience left-sided weakness at the time of the evidentiary hearing. (Tr. 39). The weakness primarily affected his left arm; Plaintiff explained that he is "reticent to use it." (Tr. 40). Although he was aware of the arm's presence and his ability to use it, he didn't find himself able or likely to do so. *Id*. Plaintiff did not have pain on that side, and he was capable of gripping a coffee cup or glass of water with some difficulty. *Id*. He also testified that he had no problems with his range of motion in that arm. *Id*.

The ALJ also examined vocational expert ("VE") Dr. Cindy Younger. (Tr. 46). The ALJ asked Dr. Younger whether work existed in the national economy for an individual who could only occasionally climb ladders, ropes, or scaffolds; occasionally climb stairs and ramps; occasionally stoop, crouch, kneel, and crawl; have no exposure to unprotected heights; and could frequently handle with the upper left extremity and finger items no smaller than the size of a paper clip frequently with the upper left extremity. (Tr. 48). Dr. Younger confirmed that jobs existed at the light exertional level in the national economy for such an individual. (Tr. 49). The hearing concluded with Dr. Younger's testimony. (Tr. 52).

**2.   Medical Records**

Plaintiff first reported to the emergency room after experiencing a stroke on April 26, 2017. (Tr. 233). While there, Plaintiff saw neurologist Richard C. Callison, M.D. (Tr.

234). Dr. Callison noted that Plaintiff experienced acute onset left-sided numbness, but that his symptoms improved with medication. (Tr. 235). Plaintiff was stable for discharge and "improved faster than expected;" he was released on April 27, 2017. *Id*.

Plaintiff experienced stroke-like symptoms for a second time on May 5, 2017. (Tr. 358). Specifically, Plaintiff experienced slurred speech and a left facial droop. *Id*. He therefore arrived at Alton Memorial Hospital for treatment and diagnosis of his stroke. *Id*. Plaintiff's treatment providers at the hospital referred him to a neurologist for outpatient care. (Tr. 363).

On May 17, 2017, Plaintiff saw neurologist Michael X. Liu, M.D., for reports of facial and left-sided numbness. (Tr. 337). Dr. Liu noted that Plaintiff's numbness resided after approximately one hour. *Id*. During an August 21, 2017 follow-up visit, Plaintiff reported a visual disturbance of the left eye for approximately one minute, and an off-balance sensation. (Tr. 343). Dr. Liu confirmed that Plaintiff's ophthalmologist had told him these symptoms were due to a blood clot in the left eye. *Id*.

Plaintiff returned to Alton Memorial Hospital on May 31, 2017 after continuing to experience slurred speech, dysphagia, an inability to keep down adequate amounts of food and water, frequent falls, and neglect of his left side. (Tr. 379). During Plaintiff's hospitalization, he improved in his ability to swallow. (Tr. 387). He also requested speech and physical therapy for continued improvement after his strokes. (Tr. 379).

Plaintiff began physical therapy at the rehabilitation center in Alton Memorial Hospital on May 25, 2017. (Tr. 555). During his initial evaluation, Plaintiff's physical therapist noted "minimal left sided facial droop, and decreased fine motor skills with the

left [upper extremity]." (Tr. 565). The therapist again noted continued left side neglect on May 30, 2017. (Tr. 571). However, on June 8, 2017, Plaintiff was "involved in [a] game of rummy and solitaire." (Tr. 572). Plaintiff used his left hand to hold, shuffle, and deal the cards. *Id*. He completed four games total without difficulty. *Id*. Plaintiff's treating physical therapist at this time also noted that Plaintiff's awareness and processing were good and normal during this project. *Id*. Her notes do not indicate whether the card game was designed to assist Plaintiff with his left-side weakness, his cognitive function, or both. However, her notes do state that continued therapy was recommended for both Plaintiff's functional activity and his cognition. *Id*. On June 13, 2017, Plaintiff informed his physical therapist that he was no longer "bumping into walls" on his left side. (Tr. 573). Plaintiff's physical therapist found that he had met all of his goals by this time, including a grip strength of eighty-six pounds. *Id*.

After discharge from the hospital, Plaintiff saw his primary care physician, James D. Ricci, M.D., for a follow-up on June 9, 2017. (Tr. 455). Dr. Ricci noted that Plaintiff was better able to eat and drink, and he was "now . . . back to normal." *Id*. After conducing a physical exam, Dr. Ricci noted that Plaintiff still had "a little left facial droop and there is a little bit of weakness in his left upper extremity." *Id*. Vascular surgeon Jeffery Jim, M.D., MPHS, FACS, confirmed to Dr. Ricci that Plaintiff experienced left side weakness and neglect on June 19, 2017. (Tr. 492). By May 14, 2018, Plaintiff reported to Dr. Ricci that he continued to have slurred speech, and that he was no longer able to drive; otherwise, he had "regained mostly everything back." (Tr. 462). On July 1, 2019, Dr. Ricci noted that Plaintiff's "muscle strength is 5 5". (Tr. 509). Dr. Ricci did not comment on Plaintiff's

specific grip strength or otherwise indicate which muscles were at a five out of five. *Id*.

### 3. The State Agency Consultants' Reviews

SAC Frank Mikell evaluated Plaintiff's medical record on August 30, 2018. (Tr. 58). Dr. Mikell found that Plaintiff had a primary impairment of vascular insult to the brain, which was severe. *Id*. He also found a secondary impairment of essential hypertension, which was non-severe. *Id*. Dr. Mikell noted that Plaintiff went to the emergency room on April 26, 2018, complaining of left-sided weakness and stroke-like symptoms. *Id*. By June 9, 2017, Plaintiff also reported being "back to his normal life;" however, there was still a slight left facial droop and a "little weakness in the triceps muscle." *Id*. Overall, Dr. Mikell found that there was insufficient evidence from prior to Plaintiff's last insured date to arrive at a conclusion. *Id*. On the October 29, 2018 reconsideration evaluation, SAC Lenore Gonzalez, M.D., confirmed that there was no medical evidence from the appropriate time frame on which to base a decision. (Tr. 68). Dr. Gonzalez therefore found nothing new to add to the timeframe of April 26, 2017 through June 30, 2017, the dates of onset through the date on which Plaintiff was last insured. (Tr. 69).

## ANALYSIS

Though the power to determine the RFC lies solely in the ALJ's hands, an ALJ may not craft an RFC without an evidentiary basis. *See Newell v. Astrue*, 869 F.Supp.2d 875, 890-891 (N.D. Ill. 2012). When deciding an appeal of a decision to deny SSI benefits, an ALJ must adequately articulate his or her analysis so that others can follow the reasoning employed. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). This articulation assists both the applicant and later courts of appeal in understanding the decision, because

without an adequate explanation, "neither the applicant nor subsequent reviewers will have a fair sense" of how the ALJ weighed the evidence that was presented. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). In outlining the decision, the ALJ must "build an accurate and logical bridge" from the evidence to the conclusion. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

This logical bridge also ensures a reviewing court can determine whether the ALJ relied on the evidence before him when making a decision, or whether he chose to "play doctor" to fill in gaps in the plaintiff's record. When crafting an RFC, an ALJ may not stray beyond his expertise as an adjudicator into the "forbidden territory of 'playing doctor.'" *Mandrell v. Kijakazi*, 25 F.4th 514, 518 (7th Cir. 2022)(quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Reversal is required if an ALJ makes his or her own medical determinations because "there is always a danger when lawyers and judges attempt to interpret medical reports." *Israel v. Colvin*, 840 F.3d 432, 439 (7th Cir. 2016)(citing *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014)). An example of this is demonstrated in *Blakes ex rel. Wolfe v. Barnhart*, where the ALJ erred by succumbing "to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was inconsistent with a diagnosis of mental retardation because no expert offered evidence to that effect here." 331 F.3d 565, 570 (7th Cir. 2003). *See also Suide v. Astrue*, No. 09-2696, 371 Fed. Appx. 684, 690 (7th Cir. Apr. 16, 2010)(finding that an ALJ "played doctor" after she rejected the only medical opinion examining the plaintiff's capabilities after a stroke and filled in the evidentiary deficit with her own opinion).

The ALJ's obligation to consider all relevant medical evidence and explain how that evidence supports his or her eventual RFC extends to the responsibility to scrutinize new evidence. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). If a plaintiff submits new and potentially decisive findings to the ALJ after a non-examining reviewer has analyzed the medical record for the purposes of a social security claim, the ALJ should seek an updated opinion from a medical expert. *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (internal citations omitted). The failure to do so may constitute uncritical acceptance of a SAC's conclusion, which is reversible error. *See Iris J.D. v. Commissioner of Social Security*, Case No. 3:20-cv-623-JPG, 2021 WL 4523483, at *3 (S.D. Ill. Oct. 4, 2021), appeal filed Dec. 12, 2021 (citing *Goins*, 764 F.3d at 680).

For example, in *Goins*, the ALJ accepted the SACs' opinions about the plaintiff, even though the SACs had not examined her directly. 764 F.3d at 680. However, in between the SACs' examination of the medical record and the evidentiary hearing, the plaintiff received an MRI for treatment of her back pain, which she alleged caused her disability. *Id.* at 679. This MRI revealed degenerative disc disease, stenosis, and a malformation in the brain tissue extending to the spinal canal. *Id.* Although the ALJ referred to the MRI in her decision, she ignored the malformation findings and provided only "barely intelligible medical mumbo jumbo" when explaining why that evidence did not support finding a disability. *Id.* at 680. On appeal, the Seventh Circuit noted that the ALJ accepted the SACs' opinions without considering how this new evidence undermined the reasoning of the consulting physicians. *Id*. Specifically, the MRI

demonstrated that the plaintiff's condition had worsened over time, discrediting the main reason the SACs found that the plaintiff's condition was not severe. *Id.*

Plaintiff asserts that the ALJ's assessment of Plaintiff's ability to perform light work with postural and environmental limitations and no more than frequent handling and fingering with his left hand lacks a sufficient evidentiary basis. (Doc. 23, p. 8). Both the SACs and the reviewing psychologists found that there was insufficient medical evidence from prior to Plaintiff's last date of insurance to evaluate his condition. (Tr. 57-60; 68-70). None of the reviewing consultants therefore submitted RFC determinations. *Id.* The ALJ also discounted Plaintiff's subjective reports of his symptoms. (Tr. 20-22).

Similarly, though Plaintiff submitted new evidence to the record at the hearing level, including Plaintiff's physical, occupational, and speech therapy from May through August 2017 and hospital outpatient records from 2018 and 2019, the ALJ evaluated the medical data in those reports himself in order to determine that Plaintiff had improved, rather than requesting review by an additional consultant or medical expert. (Tr. 20). The ALJ determined that Plaintiff was capable of handling and fingering frequently with his left hand despite what the ALJ called "subtle" and "mild" weakness in his arm. (Tr. 20). The ALJ summarily referred to Plaintiff's later medical reports, noting that Plaintiff was capable of playing cards and that he had only mild weakness in his elbow and shoulder; in doing so, he cited to Plaintiff's outpatient treatment record from June 8 and June 13, 2017. (Tr. 20). The June 8, 2017 document explains that Plaintiff was capable of using his hands to shuffle cards and that he played rummy and solitaire; it does not explain that this activity indicated only mild weakness in his hands, elbow, or shoulder. (Tr. 572).

Similarly, the June 13, 2017 record reported that Plaintiff's grip strength was approximately eighty-six pounds. (Tr. 573). However, there is no indication that this grip strength was indicative of mild weakness – that conclusion appears to belong solely to the ALJ. Just as in *Goins*, the ALJ in this case summarily referenced evidence submitted at the hearing level without obtaining consultive or other expert opinions as to what that evidence might indicate for Plaintiff's disability. The record and the ALJ's decision therefore indicate that he "played doctor" in order to resolve an evidentiary gap and arrive at a conclusion in this case.

Defendant argues that the ALJ appropriately relied on medical records which showed that Plaintiff had an improved ability to use his left hand for playing cards. (Doc. 29, p. 8). However, this argument ignores the gap left between the recording of that activity and the ALJ's interpretation of that activity as indicating improvement; an indication that is not reported in that medical document. The ALJ rejected the SACs' reports and Plaintiff's subjective symptom description, leaving him only bare medical data, which he examined and interpreted himself when crafting his RFC. In doing so, the ALJ inserted himself into the position of a medical professional, "playing doctor" with Plaintiff's medical data. Furthermore, even if the ALJ appropriately relied on Plaintiff's medical records to craft his RFC, he provides no explanation as to why the ability to play cards supports finding that Plaintiff can handle gross manipulation frequently with the left upper extremity, or why it supports finding that he could perform fingering that is fine manipulation of items no smaller than the size of a paperclip frequently. *See* (Tr. 18-19). Although the ALJ cited to some medical evidence in the record, he failed to explain

how that evidence supported his findings, leaving no logical bridge between the evidence and the RFC with respect to Plaintiff's left hand strength.[4] Accordingly, remand is appropriate in this case.

This Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

DATED: March 28, 2022.

Digitally signed by Judge Sison 2
Date: 2022.03.28 13:44:56 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**

---

[4] Plaintiff also asserts that the ALJ failed to appropriately explain his findings that Plaintiff was capable of standing for six hours, as required for "light work;" that the ALJ improperly determined that Plaintiff's peripheral arterial disease was not a severe impairment; that the ALJ did not sufficiently explain why Plaintiff's strokes did not result in mental limitations; and that the ALJ improperly discounted Plaintiff's subjective symptom allegations. *See generally* (Doc. 23). However, because the Court finds remand is appropriate regarding the Plaintiff's left hand strength, it does not address these other arguments.